Good morning, Your Honor. Tom Malone for ALCO. Let's let everybody get settled. Because we've said everything in our briefs, we're going to rest on our briefs. Did you indicate to the Court that you were prepared to waive oral argument? I wasn't asked. The Court scheduled oral argument. The Court always, it's on the form whether you want oral argument or not. You didn't indicate that you didn't want oral argument. Okay, thank you. You waived oral argument. Let's hear from your adversaries. We may have some questions for you after we hear from counsel. May it please the Court. I'm Assistant Attorney General Robert Snook, representing Robert Klee, the Commissioner of the Department of Energy and Environmental Protection, the Connecticut agency tasked with energy and environmental policy for the state. I would begin, however, by respectfully reminding the Court that this state clean energy procurement process is currently enjoined as of October. The reason I'm bringing this up is because it's a three-state, multi-year, multi-million dollar effort. I'm aware that we took the case on an expedited basis, which was no mean decision given that some of the papers only came in recently. So we understand the urgency here. Thank you very much, Your Honor. As noted, I just mentioned, however, this is a state law procurement. It was done pursuant to two Connecticut statutes, which are cited in the brief, PA 13-303 and 15-107. This is not a federal law procurement. We did not employ. My client has no PURPA authority, has no authority under federal law to set rates or to conduct any sort of procurement. I have a question, not so much about the whole first part, which is what the injunction was put on and all that, but on the second part, the Dormant Commerce Clause. My question is specifically to those like the plaintiffs' plant in New York, not the ones in Georgia that don't join in, don't join into the grid, but the ones that join into the grid. There is an allegation that they are charged more than those that are within the six-state area, that those ranks do count, but that they are charged more than those that are in the grid. There is a statement in some of the briefs that they are not really charged more, that this is simply the cost of delivering to it. But there are statements on the other side suggesting that it is an additional cost, and it's on that that I'd like more information. That is, suppose I have the state of Connecticut or a region says, wines that are made here. Well, let's better not make wines because that's a special thing under the Commerce Clause, but that soda that is made here is to be sold at a certain price, and somebody brings in soda from outside. We don't prohibit it at all, but we say soda from outside has to pay 20 cents more. That's a very different thing from the fact that the soda that is brought in from outside costs more to bring in just because it's brought in from outside. And I want to know which of the two is involved in this case. Thank you, Your Honor. The way the Connecticut REC statute, or RPS statute to be more precise, is set up is that it is designed to, in Class I RECs, are defined as certain kinds of renewable energy. The energy must be produced within the region or generated from adjacent regions and transmitted into the region. We charge no additional fee. If you are a generator in New York or New Brunswick and you are a clean energy generator, you have the rights, and remember this is an AC system without going into the weeds on this, you have to get the energy into New England so that it can displace fossil fuel. There's no fee for that charged by Connecticut. There is charges that would be charged by the companies that wheel power, that transmit power, but that would be like a soda being produced in New Brunswick that has to hire a truck or a train to bring it in. It is not something that either Connecticut or the region imposes. It's just a cost of doing it. That is my understanding, yes. You have to have the transmission rights brought in. The way it establishes transmission systems, all transmission lines have to be open access, and therefore you have to pay a fee to use that transmission line. I have no idea what those fees are. And those are the only entities that can get you the credit, right? Under the class one renewable credit, this system that we're talking about. And is the reason for that because you want to favor the New England entities that will bring energy into the states as opposed to letting someone get a credit for Georgia or Colorado or other states that are not bringing energy into the New England area? I have to take a step back, Your Honor, because this gets a little complex. There are a variety of ways that you can provide a renewable energy value or attribute into Connecticut. We have several systems. You could, for example, under consumer choice, and there are people who do this, say I want to be more green. I encourage green energy. I would buy this attribute. It can be anywhere in the country as long as it's identifiable. The specific program we're dealing with under the RPS requires the energy to be delivered into the New England grid because we are attempting to displace the fossil fuel that is being used there. That is the point. And if you cannot displace it, then it does us no good under the RPS. Specifically because, and while there are references. I'm looking at this because I'm interested in whether you are basically, whether you're arguing that you're favoring a different product. We are. One that brings energy into England, not ones that, though they may have many benefits, do not bring the energy into New England. Is that too simplistic a way of looking at it? No, Your Honor, because quite frankly we have different markets and different products here. I understand that. And as a consequence of the 29 states, seven of which are involved in this lawsuit as a defendant. One of my problems is that in some of the briefs and in the opinion below, there's a suggestion that the reason that this is okay is because different recs are different from each other. But if that is so, then you would expect to meet, to avoid commerce, the Darwin Commerce Clause, to say not it doesn't matter whether they are here or there or the other place. They have to be the same. And if they are the same, then they meet it. Now what is the same? You're arguing now the same means things that affect directly the amount of green in Connecticut. That is, they have to be part of a grid because that is what affects Connecticut. Now that I can understand, but you could have a rec which is identical to one in Connecticut someplace else, but it doesn't do anything for the Connecticut grid. I see the problem, Your Honor. There are two arguments here, and it gets a little complex. I apologize, Your Honor, because, and again, many of these are MEC briefs. The West Coast briefs are particularly dealing with carbon issues because they have different definitions of these recs. Of the 29 states, there are any number of different definitions. Connecticut, for example, is absolutely unique. That particular Class I rec in Connecticut, there are some parts of it that are similar to Massachusetts or Georgia or New York. But you don't favor Connecticut. You favor the New England region, and we're trying to figure out why. We're favoring the New England region because we're attempting to displace fossil fuel to reduce nitrous oxide in particulate matter. I understand what your goal is, but is it that only the suppliers in New England will do that, by bringing it into New England or the adjacent states, but that the recs in other states just don't give you that? A rec in Georgia or anywhere else simply won't do it. It cannot displace our fossil fuel. I have a question to go to the first part of the inquiry about the proposals that you solicit. When you get the proposals, am I right in understanding that rate is one of the things that the proposal references? The proposal will have the rate in it, yes. Okay, now, you pick the two companies, or you pick however many companies that you favor. When they negotiate with the two Connecticut power companies, do they negotiate over rates? Or is the rate the rate that was in the proposal? In all three competitive procurements, the two doing Massachusetts, Rhode Island, and Connecticut, like any competitive procurement, on the day the procurement is due, everybody submits their bid, which has a rate in it. The Connecticut system, the commissioner looks at it and selects those that meet the Connecticut environmental and energy standards, primarily greenhouse gas, all the various environmental things we talk about. Then, as the RFP says, the utilities are responsible for final contract negotiation, execution, and regulatory approval, both state and federal, ultimately FERC because they're FERC jurisdictional. Consequently, the rate, like any other competitive procurement, the rate is set, and it's held for 270 days. So the rate comes in. The Connecticut commissioner has no authority to touch it or even to change it or discuss it. Is it bargained for by the utility companies, or have the bidders basically committed themselves to a rate when they sent it to you? All bidders are committed to and required to hold that rate for 270 days. Okay. So I understand your adversary to be saying that, therefore, the rate is a factor that is taken into account by Connecticut when it picks which are going to be the favored bidders. Is that correct or not? Undoubtedly, it would be a factor. Okay. But you say that at the end of the whole process, FERC gets to decide whether that rate is reasonable, and that's what means that we don't have a preemption problem. Am I understanding your argument? That is a little slightly different, Your Honor. As the first court below, Judge Hardington found that the commissioner not only did not have the right, had any authority to change rates under PURPA, under certain exemptions they can, but we don't have that. So we can't change the rate. My adversary has chosen the rate. My adversary says that you choose the contract, you choose the rate, and, therefore, you've chosen the rate. However, this gets to the fundamental issue between bilateral contracts and in auction or the market contracts. In any bilateral contract, particularly in a competitive procurement, we are specifically permitted to do, under federal law, states are, for wholesale sales. The contracts come in. We look at them. They go into what we call the winner's circle. They, therefore, go to the utilities, who do all the negotiation, but the bidders, like they do in Massachusetts, where the state is not involved in the beginning, only at the end, the bidders, the utilities make the selection, then goes for regulatory approval at the end. The state, my commissioner, has no authority over rates, can't do anything about them. If the utility doesn't — I don't think I got an answer to the question, you know. I mean, I would hate to diagram the sentence you just said, and I didn't get an answer to the question. Is your response to the preemption argument that none of that long litany of facts that you told us matters a whit because, in the end, FERC gets to review the contract? Actually, Your Honor, my response — Is that your preemption argument here? Because, otherwise, I need to look at the whole saga that you've just displayed. If your argument is none of it matters as long as FERC gets to do the analysis in the end, that's a different argument. No, Your Honor. My preemption argument is based on pages 32 and 33 and is based primarily on this Court's statement. Three years ago, which, by the way, is the same year we passed the statute involved, where it says states have powers to direct the planning and resource decisions of the utilities. The Vermont or Connecticut legislature can direct retail utilities to purchase electricity from an environmentally friendly power producer in California. Yes, but let's answer the question. Does FERC here, at the end, have the authority to say this is not a just and reasonable rate? Yes. It does. In Maryland and Hughes, they did not have that authority. No. Maryland and Hughes are outside bilateral. Apart from all the other differences that you are mentioning, the straight answer to Judge Rodgers is that is a reason enough why we are not setting rates and, therefore, are not preempted. Yes, because FERC, at the end, makes the decision on whether it's just and reasonable. There are other reasons you give, but that is the straight answer. Yes, and the reason I gave those is very particular because if I'm wrong, if this Court concludes that the state's going for competitive procurement and selecting contracts is somehow wrong, we need direction from this Court in how we can go forward. We're basing our entire statutory process. That word direct in the Shumlin case, it's not an accident that we put it in our state statutes. We took it from here. And, therefore, and we've insisted on going because we think that what we did was consistent with Shumlin. It's FERC. This is a bilateral contract, FERC jurisdictional, FERC approved at the end. It's a bilateral contract between whom and whom? The only signatories to the contracts are the utilities, state-regulated utilities, and the developers. The state is not. So the state here is acting as a regulator. Is that right? As opposed to as a market participant because the state isn't buying the electricity, the utility is buying the electricity, and the state is telling the utility what electricity it should buy. Am I wrong? Where am I wrong in that? You're absolutely correct. The market participant, at least in my brief, is dealing with the Dormant Commerce Clause. Yeah, yeah. But not in this case. I understand that. So the procurement is ultimately being done by the utilities. Utilities. And do the utilities have any discretion at all in this process? Yes. If they don't like, if that negotiation doesn't work out for whatever reason, that the utility decides we're not happy with that negotiation, they can decline to make the purchase? Yes, they can and they have. So you're not telling them you must buy this electricity at this rate. That's the rate that the provider has proposed, and you've authorized them as a sufficiently green entity to be part of this program. But the ultimate choice about who's going to buy or not is the utility's choice. Isn't that another reason why you're not really setting the rate? Because the utility can say, I don't like that rate and I'm not taking the electricity. They could say for that. In fact, on the first procurement they declined for other reasons it wasn't the rate. On the other hand, while it is true, we use, and again, Judge Wright, the reason that we're direct is in our statute, it is not order. We do not order the utilities to do this. What happens to them if they say no? I mean, you know, how much pressure are you putting on them to buy from these? I understand that you're saying you are not ordering them. I understand you're saying these are the ones that are the right ones. I understand that you're saying that they can negotiate the rate and then that FERC has to approve it. But what happens if this utility comes in and says, look, this is the rate that we talked to with the state, and that's why we won the thing, and here we are. And the utility says, sorry, I don't want to deal with you. Does that utility just walk away home nicely, or does the state in some way, I won't say coerce them, but chills them? Well, we do, I don't, my client does not regulate the utilities, but does, in fact, deal with the environmental issues. Every domestic utility in the state of Connecticut has to show up to the regulators eventually. Again, the point of this procurement statute is that it guarantees the utility's rate recovery. And if you're a regulated utility, you live and die by rate recovery. So they're very interested in that, obviously. If there was any threat to that, they wouldn't enter the contracts. However, to answer your question, I don't see myself or my client as having any, we can, you know, hold our breath and tear and bloom. We can yell at them. We have no authority over them to make them do this. We can be annoyed with them. We periodically are, but that's it. Well, you pointed out that the last time around, some of the utilities or all of them didn't purchase, right? In the first of the three procurements, there were two bidders, two contracts failed during negotiations. I don't believe I'm talking out of school. It's public knowledge to know that the commissioner did, in fact, then commissioner, not this commissioner, did, in fact, we had discussions with them, like we really like these projects, what's going on here. There were some discussions back and forth. Those utilities, those particular bids failed. It never happened. Nothing, no adverse consequences, at least as far as the record is concerned? Nothing in the record. I got yelled at by my commissioner. Let me ask another question so that we're sure we understand how this all works. Sure. So the companies negotiate, and let's say they reach an agreement with the bidder, and they enter into a contract. Does a QF, such as the plaintiff, have the ability at that point to invoke the PURPA right to come in and say, well, we can do it cheaper, and we therefore want to displace, and we want to get paid the alternate rate? I don't think so under this procurement. I hadn't looked at it, but the PURPA rights under federal law are separate and distinct and exist apart from this. And that's what I needed to understand. We are doing this procurement, the plaintiff is, and it's part of the record, is in fact pursuing PURPA contracts with one of the two utilities through the PURPA system, which is asking the utility for a contract, then going to PURPA, and then ultimately going out of system. That's an exception. The PURPA is in a way an exception to this normal way of doing things. It is a statutory exception that the federal government has given the states more authority than they would normally have. That's correct. And then they have to meet the PURPA. But if you're not outside what you're normally doing, you don't have to get into the PURPA issue at all. Yes. I think to be very clear with Judge Radji, because this is a state law procurement, I don't think, and we don't have avoided costs, my client doesn't have that, which is the key of PURPA, I don't think I could take my avoided costs and then translate it into a PURPA contract. So the avoided costs would be only when the utility companies themselves initiate the purchase from a supplier? Actually, no. Let's do it this way. When would the QF be able to assert its PURPA right? Excellent. The QF would come up with a project, approach one of the two utilities and say, I have a mandatory must-buy contract here at Eversource or United Illuminating, you must buy this. The contract could then be accepted by the utility, which would then go for, not through my client, but through a separate process through PURPA to get their avoided cost rate and cost recovery through our PUC. Let's just say they just entered into a contract with Nine Wind or whoever the other successful buyer was. Six months after that, a QF can come knocking on their door and say, you know, we've got this project and you have to buy it. Does the utility company get to say, we don't need it, we just entered into this contract with these other entities. How does it work? My knowledge is it's mandatory and must-buy. The utility must purchase that subsequent QF contract. If they have a problem with it and if it's for some reason not prudent, then they would have to go whatever rights the parties have under PURPA. Since my client doesn't deal with that, we never see that. But if the state goes out and buys 400 megawatts under this procurement of clean energy, six months later a developer comes up with a new plant, that developer under PURPA gets to go to the utility and gets the contract whether we like it or not. Is that why you say that all of this procurement and all of that that you've just described for us has no effect on their PURPA rights? Absolutely. That is correct. Okay. Thank you. Unless there are further questions, I'll move to my co-counsel. Good morning, Your Honors. May it please the Court, my name is Seth Hollander. I'm an Assistant Attorney General representing Pura Commissioners Dykes, Pekoske, and Caron. I'd like to echo my colleague's request that the Court lift the stay that's in place as soon as it's practicable, that the Court affirm the District Court's decision below and allow Connecticut's procurements to go forward. I'd like to follow up on a point that was discussed earlier about the Dormant Commerce Clause question about why the state relies upon this regional function. There is a regional clearinghouse function that is performed by the New England Generation Information System, I'm sorry, NEPOOL GIS. So I just wanted to emphasize that part of the equation as well. The recs that we get from NEPOOL GIS, we know that where they come from, every single one is tagged to generation in New England or imported into New England through the appropriate protocols. And every single one of them is retired, counted for, and it ensures against double counting. So there's an underwriter's laboratory clearinghouse function that is also performed by this. And I also want to- Is that true of anything that gets into your grid? So that the New York one or the ones that are generated within the region all meet that requirement? Because it is being into the grid that makes you, is the way you can be sure that requirement is met? Is that what you're saying? Yes, Your Honor. The imports are counted up by the NEPOOL GIS just in the same way that the domestic generation is counted up. All of it is counted up and it is accounted for. It's given labels. It's either renewable or it's not renewable. If there were some way for something in Georgia somehow to connect to your grid, that would be okay. It's just that it can't be done. The rules would have to change in the NEPOOL GIS. The rules of the NEPOOL GIS currently state that the generation has to be either generated within New England or has to come through an adjacent control area. So it doesn't look outside the adjacent control area. But the reason it doesn't is that it wants to have significant enough confidence that the fossil fuel generation actually is being displaced. That connection in those rules is what gives everybody the confidence that the system is doing what we want it to do. But if it is that rather than actually doing something in New England, couldn't you accomplish that by having a very heavy burden of proof on that organization to show that they are doing that? That is, is the requirement that they actually come in and do it? Now, I can understand the requirement being justified by saying if it is in the grid, it certainly helps the air in New England. Well, if it is in something else, it may in some very indirect fashion, but that's just too much to ask of us. But now you're saying it's because we don't know what they are like. And if that were the thing, couldn't you deal with it by a burden of proof? No, Your Honor. It's that we don't know that the GIS rules give us the certainty that fossil fuel in New England is being displaced. It's not that we don't know whether those are actually solar or those are actually wind or actually what they are. If they come into the New England grid, you know that they are displacing some dirty fuel. Yes. Yeah. Okay. So that we're clear, the reason we're dealing with New England rather than just Connecticut or Connecticut and Massachusetts or something, the reason we're dealing with this New England grid is that this is the grid set up by the federal government, right? Yes. Yes, Your Honor. Okay. It's the grid that serves New England and Connecticut. So it wasn't a Connecticut or a decision among these states to form themselves into some kind of cooperative. This is the federal government's creature. Yes, Your Honor. Yeah. Okay. Thank you. In fact, the rule that I was speaking about before, the Nepal GIS rule, is actually also in some way. We just put it in our brief. Nepal GIS, this is auspices of the federal government on the rule itself. I want to touch on the rate-making question from earlier, emphasize that FERC is the only jurisdiction with rate-making authority over the contracts that are produced in the auction. I mean, sorry, in the procurements. FERC is the only rate-making authority. FERC has the only. They're not just the last word. They're the only word on whether the rates that are produced in these contracts are just and reasonable. This is their stage, and we're just players in it. And if one of the regulated utilities said, boy, we think this is a terrific program and we're happy, but it just costs too much, and the bidder said, well, you know, we can manage to cut it by a penny, is that allowed under the state system? In other words, the bidder is committed not to that rate, but can the bidder reduce the rate in these negotiations with the utilities? I don't see anything prohibiting it. I would imagine that getting a lower rate than was contemplated would be welcome. It would be welcomed by the utility. It would be welcomed by, I think, the regulators. Regulators would be happy, too. Yes. And then FERC would decide whether that's a fair and just rate. Yes. So the fact that you have selected a bidder that proposed a certain rate does not prohibit the parties from renegotiating that rate, the parties being the utility and the selected bidder from renegotiating that rate. I don't know of anything that would prohibit that. And, indeed, one of the utility could say to the selected bidder, listen, if you insist on this rate, I'm going to say to FERC that that's not an adequate, that that's not an appropriate rate, that that rate is too high. So you'd better come down because otherwise I'm going to argue to FERC that this is charging too much. That could happen. I believe they would have rights at FERC as well. Yes. May I ask this again just so that we know how this could work? They're in negotiations, and the utilities want some other assurance of accommodation on something, and the bidder says, you know, we hadn't understood that that was going to be part of the deal. We can do it, but we need another penny more or two pennies more or whatever. And the utility says, well, it's important enough to us that we would pay that. Can that kind of a change be done, too, a slight negotiation up as well as down? I suppose so, Your Honor. I suppose that would be. Well, I'm asking if there's anything in Connecticut law or regulations that prohibits it because we're trying to find out whether or not there's an argument that Connecticut is setting the rate. Well, I would also, if I could step back for just a moment, Your Honor. I worked for the utility regulator for a lot of years. I mean, setting a rate certainly is looking at the books and records of a utility. Setting a rate is creating a formula that you know produces a just and reasonable rate. Setting a rate is a construct that FERC has set up that says allow competition to happen and file something after the fact and we'll keep post hoc authority to review something for just and reasonableness. We cannot set interstate rates. And this is an interstate contract. So we're trying to figure out whether there's a viable argument that you're setting an interstate rate. And I just want to slot this in terms of jurisdiction that the Hughes case sets out. There are two avenues. There's the auctions that FERC sets forth and there's the bilateral contracts they set forth. And that was a problem with Maryland. It wasn't driving in either of those lanes. It picked a third lane to drive in. And so what's happening here is in strict accordance with the two lanes that is set out. So what you're saying is setting a rate is something of a term of art complicated by the fact that what used to be considered rate making is now changed at the federal level to this auction system which is not quite what used to be the way regulators set rates. Yes, the auction produces a just and reasonable rate. The physical bilateral contract structure will produce presumably once it's approved and everything through FERC just and reasonable rates. But that's not a power that my client is trying to exercise at all. We don't know whether it's just and reasonable. We have no idea. But, again, to get back to Judge Radji's question, when those negotiations happen, was your answer that there's nothing in Connecticut law that would preclude a utility from trading off something else they want for a rate that is higher than the bid that originally led to the selection of this supplier?  I'm trying not to answer the question. My client is at the end of the chain on this construct where the contracts, once completed, come to my client. Maybe we'll let Mr. Malone see. I'm sorry, Mr. Snook tell us if he has a view on this. But go ahead. I don't believe there's anything that prohibits that. I can imagine that when something is presented to Pura, Mr. Snook's client could appear and say, wait a second, that's not what came out of. We'll hear from him on that. Okay, thank you. Mr. Snook, before we hear from Mr. Malone, can you just tell us, can the utilities do penny up, penny down, depending on what the other terms of the negotiations involve? The terms of the RFP require the bidder to hold the price fixed. However, that's the only thing it says. I don't believe, again, that I'm straying when I tell you that sometimes bidders have, in fact, because it's a 270-day window, bidders have, in fact, informed us that the price of solar cells went down and they wanted to drop their bid price. Nothing in Connecticut law prohibits them from doing that. The penny up, as you mentioned, I have not heard that. The only way I could see that happening is after the commissioner has selected the winner's circle. It goes to the negotiations. Something happens in the negotiations. The bids then go to Pura. My commissioner would have the right of commenting and saying we like it or don't, but I can't do anything at that point. In other words, they have to hold the rate once the rate, once the contract is made. They can't change the deal. Yeah, the problem is, Your Honor, is that this is very a complex process, and when you bring in hundreds of megawatts potentially, that is, we have to forecast. We have to do all this stuff, so we hire consultants, and so we tell the bidders, just to be fair, so you don't start fighting amongst yourselves or we start bidding against ourselves, bring us a bid, $0.10 a kilowatt hour. You agree to hold that, that bid, after, for 270 days. What happens after that's another problem. If you lower your bid, that can be considered. If you want to raise it, I haven't seen that, but there's nothing in Connecticut law that prohibits it. Could it, I mean, this is an attack on the law as a whole. If it happened that that started happening, that somebody wanted to raise the bid, and Connecticut or someone would then prohibit that, could that then be attacked if that ever happened? Our main concern, I'm speaking very, very clearly here, Your Honor, we have been very concerned that in a competitive bid, we treat all bidders the same. If one bidder comes to us privately and says, we'd like to drop our bid, we have to make that public knowledge. We have to be open and transparent about this. Okay, thank you very much for trying to clarify that all for us. Mr. Malone. Thank you, Your Honor. The case here is really simple, because the state is compelling a wholesale sale. That, they only have the legal authority to do if they're acting under PURPA. The rate is only one part of a wholesale sale. This is undoubtedly the compulsion of wholesale transactions. Now, which part of PURPA do you say precludes this sale? Which statutory section would you urge us to look to for that limitation? Under Section 210A and F, that's where the state gets the authority to compel a wholesale sale under the FERC rules. I'm puzzled. I didn't think they were compelling the sale. The utilities apparently remain free to decline to purchase any of this energy. I don't think that's true, Your Honor. And I would direct the Court to the Joint Appendix AX66, where the utility admits that, and this is for the solicitation they did in 2013, where the utility admits that they did not do any analysis of the transaction. It's not up to them to decide whether the transaction is worth entering into. It is the state law that charges the authority, and not the utility, to do that. But the registry says that they didn't enter into one of the contracts. Yeah, so. Or who did? What's your response to that? All right, so it wasn't the utilities that declined. It was the bidders. Two of the bidders that were selected declined because there was a provision in the standard contract which said something along the lines of if the authority, at any point in time, declines to continue to allow them to pass through this in rates, that the utility could terminate the contract. And a bidder in most banks will not finance a project if the utility has a right to just terminate the contract like that. That is why those contracts fell out. But if the utility has the right to terminate the contract, how is the utility compelled to purchase electricity? If it's compelled to enter the contract, then there's a provision that it can terminate. What's the compulsion? So it would have a provision that it could terminate if the state then, in the future, declined to allow a recovery of the cost in rates. It's still a state-compelled contract. It's not a voluntary contract that the utility enters into because utility just, they do not use the power to service their retail load either. Yes. What happens if FERC says this rate is not reasonable? Does the contract remain? Well, the example of FERC's role can be found in the use case. The generators can be found. Answer my question. I, you know, how FERC operates is another matter. That's its business. What I want to know is if FERC chooses to say this is not an appropriate rate, what happens then? Well, in theory, FERC has the authority to say that it's not an appropriate rate. FERC does not make that decision under current FERC rules, though. But that's a different question from whether it has the authority to do so. And your question is, your statement is that Connecticut is preempting federal law. It's not a preemption if FERC is deciding not to take certain action that it could. So you have to deal with the fact that Connecticut represents that at the end of this process, FERC could say no good on the deal. And if FERC can say no good on the deal, especially in light of the Supreme Court's decision in Talon, how do we not, how do we accept your preemption argument as long as FERC has that authority? Well, because in Hughes and Nazarian, the courts said that it's the court that decides whether the contract is a valid contract in the first place. FERC also said that. That's a different question. And Hughes involved a completely different scenario there in terms of what FERC could do. If it's correct that here, these contracts don't go into effect until FERC signs off on them, I'm not sure I understand how there's a preemption problem. Well, FERC does not sign off on the contracts. I mean, in theory, they could. They do not even get the contract. No, they don't. Okay. Why don't, you know, you didn't want to argue. Why don't you tell us your view of what FERC's role in this is? All right. So FERC, in terms of, say, a state-compelled contract, will not get the contract. Once the facility is built, the generator will file a form for what's called market rate authority, and they will note that they have entered into a contract in connection with that authority, and this would be a notation as to the contract. The FERC does not get the contract. The FERC does not want to see the contract. And the FERC has made that clear, that they don't pass on the rates, because what they do is they rely on the two paths of voluntary bilateral contracting. Is that FERC's own judgment, or is that something that Connecticut is depriving FERC of the authority to do? Yeah. I mean, you know. Yeah, that's FERC's own judgment. It's FERC's own judgment. If it's FERC's own judgment, how is there a federal preemption? How is there a preemption problem by Connecticut? Because the state is compelling the wholesale sale in the first place. But not when FERC has the ability to go in and say yes or no on it. FERC may not wish to do that because it's perfectly satisfied with what Connecticut's doing, but as long as it has the authority that the law gives it, I don't see how Connecticut's preempting them. What am I missing? Yeah. I mean, the point, I guess, from a preemption standpoint, is that the state has no right to intervene in the contracting. You're saying that they can't set it up in the first place. You're making an argument, rather like the Third Circuit, that said just all of these things are the state doing more than what it is allowed to do because pricing isn't the only thing. The only problem is that the only Supreme Court cases that we have that bear on it go the other way on that. But let me ask you, if I may, a dormant commerce clause question. We've been told that New York-based can get into the grid, and that the cost is simply the cost of getting the stuff to it, but this isn't an added price that is put on outsiders because they are outsiders. Your brief seems to take a different position on that. Well, yeah. A New York facility would have to acquire transmission rights to transmit it into ISO New England. But our position is that the wreck generated by the solar facility in New York has the same environmental effects as the wreck in ISO New England. Where? Where does it have the effect? In New York. Well, in the air, I mean. But in New York is where it has the effect, the immediate effect, right? It has the first effect in New York, that's correct. And their concern is they want to favor, and that's what they're doing when they give the credits, they want to favor clean energy sources in New England because that way they know that they're displacing other fossil fuel and other kinds of fuel that are disfavored. Why isn't that something that they're allowed to do under the Dormant Commerce Clause? You're not offering the same thing. You're not offering the effect in New England. Yeah, I think that's where we disagree from a factual perspective because, and it's not only our judgment, but it's the judgment of the ISO New England operator itself, which we discussed in the reply brief. They themselves have said, of Connecticut's restriction, that it doesn't provide any more benefit than if there was a generator in New York that did not deliver their energy. And in Georgia? That's the, yeah, I mean. Because you're complaining about both, so I want to be sure that, you think that a plant in Georgia has the same effect in New England as a New England plant? Well, I think it's a question of fact. And for sure, from a climate change perspective, it has the exact same benefit. All right. I have some questions for you about the standing challenge that's been raised. First of all, can you tell us which bids you're still challenging? Is it 2013 and 2015 or only 2015? It's 2013 and 2015. Right, starting with the 2013 bid. I understand your complaint is that the process shouldn't have happened at all. You were a bidder in that. You did not succeed. You're not looking, though, to upset the results of the bid as a whole. You only looked to vacate the bid as far as it went to Nine Wind, right? That was the prayer for relief. That was a specific prayer for relief. So you weren't looking to upset the bid as it went to the other entity? No, not any longer. If that's so, and now that Nine Wind, that contract is gone, what's the injury to your client with respect to the 2013 bid? Now that this is a PURPA case, I think the district court would have the authority to go back and order the state to provide us the contract we would have gotten if the larger project was not there. Well, how do we know you would have gotten the project? I mean, they ranked them, and I understand two of your entities were fourth and fifth, right? Fourth and seventh, that's right. Fourth and seventh, right. How do we know you would have gotten them? Well, I think that's a factual determination. But now we're talking about whether you've got an injury in fact that's concrete in particular. Well, we did allege that we would have gotten them. I think there's a good basis. On what? What's the good faith basis for thinking you would have gotten them? Because if number nine wasn't there, sure, the commissioner could have decided, well, I'm only going to pick this one small project. Well, you know, they didn't even pick the 4% they were entitled to pick. They picked less than that. So under those circumstances, it's not clear whether they were concerned about percentage or whether they were concerned about the quality of the bid. All right, but you're claiming that you're looking for the bid. Is that something you asked for in your complaint? Or did you just ask to have nine wind vacated? The only specific relief in the complaint was to vacate nine. All right, okay. Now, on the 2015 bids, you didn't bid at all on those. And I'm not sure how you have standing to complain about a bid that you didn't participate in. Help me out on that. What's your concrete injury on that one? Our injury is, well, because we're a QF. So this is viewed as a QF complaint. And our injury would be that if we had bid, there would be the increased competition from non-QFs, the same problem that there was in 2013. But you're not even a bidder, so how are you hurt by that? Well, yeah, we would have bid if we didn't have to pay the fees. What fees? There were fees charged to bid into the RFP. That's always the case, isn't it? No. But was it the case for every other bidder? It was in 2015. It was not in 2013. And anyway, how is that injury caused by their violation of the limitations on their ability to set rates? I mean, it seems to me that the injury you're complaining about, that they were charging a fee, which everybody had to pay, is totally unrelated to the rates, or at least attenuated from it. What am I missing? Well, if a QF has the right to sell at a certain price, our point is that they shouldn't be charged to sell at that price. Okay. Well, that comes to my last injury question. If I understood your adversaries correctly, no matter what happened in this bidding process, your client can always knock on the door of the Connecticut utilities and say you have a qualified project that they have to accept under PURPA. Is that correct, or do you view it differently? In theory, that would be correct. In practice, the state and the utilities have opposed that. Where is that in the record so that we know where to look for it? All right, so I'm not sure if we discussed it in our opening brief. We do discuss it in the reply brief, because when we actually did go to the state and the utilities and said, we have these projects, we want our avoided cost rate, long-term avoided cost rate, because that's the only kind of rate that will allow a project to be built. The utilities said, no, you can only get this as available rate. That's all we're going to give you. Now, Massachusetts had the exact same thing. District Court in Massachusetts, it was a case of ours, declared that unlawful. But you haven't sued for that refusal, right? Yeah, not in this case. So, again, here, if you're right that they have to take the QF, how does the bidding process hurt you in your perp rights? Okay, so the other way, if we assume that the state did honor their obligations and give us the right rate that we're entitled to at the long term, then the other way it hurts us, which we offered an expert opinion on and gave a specific amount, is by them increasing the supply of renewable energy from non-QFs. That hurts the number that we're entitled to. Well, you see, some people in Connecticut might think that it's a good thing for the state to have increased energy. So what right that you have to a higher rate is injured by greater competition with respect to more alternative energy options? If the greater competition just came from the operations of the market, that's fine. When the greater competition comes from a regulation by the state, that's the problem. Even though FERC has the ability to, you know, put a stop to it if they think it's unreasonable? Well, FERC has no authority to enjoin the state. You said that they would have the ability to say no on any of those contracts. They just aren't exercising their authority. That's where we started. Right. They have the ability to, if they chose, to review a specific contract. They have no authority to try to enjoin the state from what they're doing. They do it at the end, not at the beginning. I think Judge Calabresi has some questions for you. My question goes to these standing questions that have been asked. Is that a standing question that is a constitutional standing question, or is it a statutory? That is, is it a question of whether you have been given enough rights under a statute and could be given, or is it a question of whether you have anything that is a real case in controversy? That's important because if it is a question of constitutional standing, then we must decide that before we decide anything else. If it's a question of statutory standing, we may assume that you have standing and go on to discuss other issues. But I just would like to know if the standing issues are case in controversy, or if they are how the statutes are written. I think the issue that's being raised is it's a constitutional one because this Court's decision in the first ALCO case said this would be a case to be brought under PURPA. It might be better for you if it weren't constitutional. Anything else? That's it, Your Honor. Thank you. Thank you. I do think since it was somewhat unusual that Mr. Malone made most of his arguments on rebuttal rather than that, I just want to give you, Mr. Schnook, one or two minutes. Is there anything that was said about the way Connecticut law operates just now that you want to dispute? I have nothing further I'm relying on. I just wanted to be sure. Thank you. Thank you both. We're going to take this matter under advisement. The Court stands adjourned.